1  Thomas W. Lathram (State Bar No. 59639)
   Tom@SiliconEdgeLaw.com
2  Arthur J. Behiel (State Bar No. 172165)
   Art@SiliconEdgeLaw.com
3  Steve P. Hassid (State Bar No. 219913)
   Steve@SiliconEdgeLaw.com
4  SILICON EDGE LAW GROUP LLP
   6601 Koll Center Parkway, Suite 245
5  Pleasanton, CA 94566
   Telephone:  (925) 621-2110
6  Facsimile:  (925) 621-2119

7  Attorneys for Plaintiff, Counterdefendant
   and Counterclaimant
8  BRILLIANT INSTRUMENTS, INC.

9

10                    UNITED STATES DISTRICT COURT

11                 NORTHERN DISTRICT OF CALIFORNIA

12                         OAKLAND DIVISION

13  BRILLIANT INSTRUMENTS, INC.          Civil No. C09-05517 CW (JCS)

14                  Plaintiff,           **[CORRECTED] BRILLIANT
                                         INSTRUMENTS, INC.'S OPENING
15          v.                           CLAIM CONSTRUCTION BRIEF AND
                                         MOTION FOR SUMMARY JUDGMENT
16  GUIDETECH, INC., and                 OF NONINFRINGEMENT**
    RONEN SIGURA, an individual,
17                                       Judge:     The Honorable Claudia Wilken
                    Defendants.          Date:      Thursday, June 2, 2011
18                                       Time:      2:00 p.m.
                                         Location:  Oakland, Courtroom 2, 4th Fl.
19

20  _____
    and Related Counterclaims
21

22

23          Plaintiff, Counterdefendant and Counterclaimant Brilliant Instruments, Inc. ("Brilliant")

24  hereby submits its Opening Claim Construction Brief and Motion for Summary Judgment of

25  Noninfringement, all in one brief, pursuant to the Court's Minute Order and Case Management

26  Order, ("CM Order", Dkt. 29), entered herein on May 4, 2009.  The hearing on claim construction

27  and Brilliant's motion for summary judgment will take place on Thursday, June 2, 2011, at 2:00

28

1  p.m., at the Ronald V. Dellums Federal Building, 1301 Clay Street, Oakland, California,

2  Courtroom 2, 4th Floor, pursuant to the CM Order.

3       The motion for summary judgment is made pursuant to Federal Rule of Civil Procedure

4  56, and seeks a judgment of noninfringement of all patents-in-suit against Defendant,

5  Counterclaimant and Counterdefendant GuideTech, LLC ("GuideTech").  The opening claim

6  construction brief and the motion for summary judgment are supported by the Declaration of

7  Arthur J. Behiel in Support of Brilliant's Opening Claim Construction Brief and Motion for

8  Summary Judgment of Non-Infringement ("Behiel Decl.") and the exhibits attached thereto, and

9  the Declaration of Dr. Martin Kaliski, Ph.D. in Support of Brilliant's Opening Claim Construction

10  Brief and Motion for Summary Judgment of Non-Infringement, ("Kaliski Decl."), both filed

11  herewith

## TABLE OF CONTENTS

Page

I.  INTRODUCTION AND SUMMARY ................................................................. 1

   A.  Time Interval Analyzers ...................................................................... 1

   B.  The Asserted Patents—Two Simple Dispositive Issues ................................ 3

   C.  The '231 Patent ................................................................................ 3

   D.  The '649 and '671 Patents .................................................................... 4

   E.  Other Bases of Noninfringement—Two Other Dispositive Issues .................... 4

II. CLAIM CONSTRUCTION PRINCIPLES ........................................................ 5

   F.  The Law Governing Claim Construction .................................................. 5

   G.  A Person of Ordinary Skill in the Art .................................................... 6

III. CONSTRUCTION OF THE DISPUTED CLAIM TERMS ................................. 6

   A.  Signal Channel ................................................................................. 6

   B.  Defined Within a Signal Channel ......................................................... 7

   C.  Current Source ............................................................................... 10

   D.  Current Sink .................................................................................. 12

   E.  Operatively Disposed in Parallel ......................................................... 12

   F.  Parallel Outputs .............................................................................. 14

IV. SUMMARY JUDGMENT OF NONINFRINGEMENT ..................................... 14

   A.  The Law Applicable to Summary Judgment ........................................... 14

   B.  The Law of Infringement .................................................................. 14

   C.  Dr. West's Expert Witness Testimony Should be Disregarded ...................... 15

   D.  Noninfringement of the '231 patent ...................................................... 17

   E.  Noninfringement of the '671 patent ...................................................... 20

   F.  Noninfringement of the 6,181,649 (the '649 patent ................................... 25

   G.  Brilliant Does not Infringe the Unopposed Patents .................................... 25

V.  CONCLUSION ........................................................................................ 25

1

<u>TABLE OF AUTHORITIES</u>

2

**<u>Cases</u>**

3

*Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282 (Fed. Cir. 2009)........................................15

4

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ...................................................14

5

*Autogiro v. U.S.,* 384 F.2d 391 (U.S. Ct. Cl 1967) ......................................................5, 9

6

*C.R. Bard Inc. v. U.S. Surgical Corp.,*388 F.3d 858 (Fed. Cir. 2004) .............................5

7

*Exigent Tech. v. Atrana Solutios, Inc.,* 442 F.3d 1301 (Fed. Cir. 2006).........................16

8

*Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605 (1950)....................15, 22

9

*Key Pharms v. Hercon Lab. Corp.,* 161 F.3d 709 (Fed. Cir. 1998)...................................6

10

*Lemelson v. United States,* 752 F.2d 1538 (Fed. Cir. 1985) ..........................................14

11

*Markman v. Westview*, 52 F.3d 370 (1996) ......................................................................5

12

*Moto-Mower Co. v. E. C. Stearns & Co. Inc.,* 126 F.2d 854 (2d Cir. 1942) ....................5

13

*Phillips v. AWH,* 415 F.3d 1303 (Fed. Cir. 2005).........................................................5, 9

14

*Remington Rand, Inc. v. Meilink Steel Safe Co.,* 140 F.2d 519 (6th Cir. 1944) ...............5

15

*Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576 (Fed. Cir. 1996) ...............5, 8, 12, 14

16

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17 (U.S. 1997) .................23

17

*Westinghouse Electric & Mfg. Co. v. Formica Insulation Co.,* 266 U.S. 342
(1924) ......................................................................................................................5

18

19

20

21

22

23

24

25

26

27

28

1    **I.    INTRODUCTION AND SUMMARY**

2         This case is as much a dispute between two individuals, Shalom Kattan and defendant

3    Ronen Sigura, as it is a patent case between their respective companies. Mr. Kattan is the founder

4    and president of Brilliant, and is also the founder and former CEO of GuideTech's predecessor,

5    Guide Technology, Inc. ("Guide"). Mr. Kattan founded Brilliant after he was forced out of Guide

6    in 2004 by investors who had a different vision. Mr. Sigura is a former employee of Guide who

7    formed GuideTech in 2008 to purchase Guide's assets, including its patents, when Guide

8    recognized that it could no longer compete. Both Brilliant and GuideTech sell products known as

9    "time interval analyzers" ("TIAs"), which are used to test integrated circuits.

10        In response to a threatening letter, Brilliant filed this declaratory judgment action on

11   November 20, 2009, seeking a declaration that Brilliant does not infringe seven of GuideTech's

12   patents.[1]  GuideTech counterclaimed, alleging infringement of three of the seven patents-in-suit,

13   U.S. Patents 6,091,671 (the '671 patent), 6,181,649 (the '649 patent) and 6,226,231 (the '231

14   patent) (collectively, the "Patents")[2]. Somewhat unusually, the president of Brilliant, Shalom

15   Kattan, is also the sole inventor of the Patents. That fact may or may not be relevant to issues

16   relating to invalidity, but it is irrelevant to infringement.

17        **A.  Time Interval Analyzers**

18        The Patents are directed to "time interval analyzers" (TIAs). TIAs are complex, but the

19   underlying operational theory is not.  TIAs measure time intervals between signaling events. The

20   following diagram illustrates a basic measurement function of a TIA, which is to measure the

21   width of a pulse, or "pulsewidth," of a signal. The signal, applied to a "channel" of the TIA, is

22   expressed as voltage that changes with time to define a pulse between rising and falling edges. The

23   rising edge serves as a "start event" for the TIAs and the falling edge a "stop event." A clock

24   signal "Clock," also a changing voltage, oscillates at a time period T and serves as a timing

25   reference.

26   To measure pulsewidth, the TIA records a start count "Start=2" on the first rising clock edge

27   ───────────────

28   [1] Patent Nos. 6,091,671; 6,181,649; 6,226,231; 6,456,959; 6,621,767; 6,999,382; and 7,203,610.
     [2] The Patents are attached to the declaration of Arthur J. Behiel as Exhibits A, B, and C.

following the start event and a stop count "Stop=5" on the first rising clock edge following the

stop event. The coarse pulsewidth measurement is the difference between the stop and start counts



(5-2) multiplied by period T, or 3T.

The signal events are not synchronized to the clock signal, so events can, and typically do,

occur between clock edges.  The resulting time fragments, labeled "head" and "tail," are too short

to be measured using the clock signal. TIAs therefore include measurement circuits called

"interpolators" that measure the head and tail fragments to facilitate more precise measurements.

Interpolators of the type used in TIAs are commonly referred to as "time-to-voltage

converters" because they convert a time fragment into a voltage proportional to the fragment.

Voltages representative of the fragments are "time signals" in the words of the Patents and are

used to improve measurement precision. In the foregoing example, the head and tail are subtracted

from the start and stop counts to more precisely time the start and stop events. The pulsewidth can

then be calculated by subtracting the corrected start time from the corrected stop time.

Interpolation takes a long time relative to measurement intervals of interest. The tail

fragment is thus likely to arrive before completion of the measurement of the head fragment. TIAs

therefore typically require two interpolators, one for each of the head and tail fragments. The times

of interest are exceedingly short; for example, the accused BI200 has a clock period of 1.6

nanoseconds and provides measurement resolutions of about three picoseconds.[3]

The Patents are directed to improvements in TIAs. As of the priority date of the '231

patent, TIAs generally included two interpolators for two or more signal channels. Measurements

_____

[3] One nanosecond is one billionth of a second, a picosecond a trillionth. To provide a frame of
reference, light travels about 186,000 miles in one second, one foot in one nanosecond, and a
hundredth of an inch in a picosecond.

1   like pulsewidth that use both interpolators leave no interpolators for the other channel(s), so only

2   one channel input could be used at a time. The '231 patent relates to a TIA with multiple

3   interpolators per signal channel. Measurements like pulsewidth, which require two interpolators,

4   can thus be performed by multiple signal channels at the same time.

5        The '649 and '671 patents present claims to interpolators that include components called

6   "current sources" to set and maintain the interpolator output voltage at a precise known level

7   between measurements. The interpolations change this output voltage from the known level to a

8   level—a "time signal"—that represents e.g. a head or tail fragment. The change in the interpolator

9   output voltage represents the interpolated time, so presetting the initial voltage to a precise, known

10  value improves interpolation accuracy. Claims of the '649 and '671 patents also recite a "current

11  boost" circuit that reduces the time required to reset the interpolator in preparation for a

12  subsequent interpolation.

### B.  The Asserted Patents—Two Simple Dispositive Issues

14       The specification and figures of each of the three Patents are the same. Only the claims are

15  different. Although a number of issues are presented by this combined brief, it is necessary that the

16  Court resolve only two relatively simple issues to dispose of the entire infringement case.

### C.  The '231 Patent

18       The first dispositive issue has to do with a limitation in the asserted claims of the '231

19  patent relating to the number of interpolators, or "measurement circuits," that are "defined within"

20  a particular signal channel. Prior TIAs with only one interpolator per channel could not do "two-

21  event" measurements on more than one channel at a time. The '231 patent claims include a

22  limitation that provides for "a plurality of measurement circuits defined within a signal channel."

23  In other words, Mr. Kattan added an interpolator to each channel so that there were two

24  interpolators per channel. Such devices could simultaneously and independently perform, e.g.,

25  measurements on two or more channels.

26       When Mr. Kattan designed Brilliant's new products, he greatly improved the speed and

27  general operation of the devices but he purposely included only one interpolator per channel, and

28  thus avoided infringement of the '231 patent. To assert infringement, GuideTech has been forced

1   to adopt an absurdly broad claim construction of the term "defined within a signal channel" that

2   reads on the prior art, including expired patent prior art, GuideTech's own products that Guide was

3   selling well before the filing of the application for the Patents, and prior art cited in the file history

4   for the '231 patent.

5          **D.  The '649 and '671 Patents**

6          Another improvement Mr. Kattan made, as reflected in the claims of the '649 and '671

7   patents, is the addition of a "current source" to the internal design of the interpolators. There are of

8   course differences between the claims of the two patents relating to other design aspects of a TIA,

9   but "current source" is common to all the asserted claims. The Brilliant products have greatly

10  simplified interpolators that do not require or include the recited additional "current source."

11         GuideTech recognizes that Brilliant's products do not include the claimed current source

12  but asserts that Brilliant infringes under the doctrine of equivalents. To make this argument,

13  GuideTech has adopted a series of inconsistent, confusing, unsupported and absurdly over-broad

14  constructions of a number of claim terms, including "current source" and "constant current

15  source." GuideTech's position on infringement of this limitation is a hopeless mess, which is not

16  surprising in view of the substantial differences between the design reflected in the Patents and in

17  Brilliant's products.

18         **E.  Other Bases of Noninfringement—Two Other Dispositive Issues**

19         The foregoing two relatively simple issues dispose of the infringement case in its entirety.

20  In the unlikely event that the Court were to disagree on one or both of those issues, however, there

21  are additional issues that are fully dispositive. Those issues are not related to the inventive aspects

22  of the Patents but nevertheless are related to limitations included in the asserted claims that are not

23  met in Brilliant's products. For example, the asserted claims of the '231 patent include a limitation

24  requiring that a processor circuit in the TIA "compare" the "time signals" that are the outputs of

25  the measurement circuits with each other to determine a time interval. Brilliant's products simply

26  do not work this way. Instead, Brilliant's products combine each time signal with other data to

27  create something called "timetags." These tags are created and manipulated by a processor in the

28

1   host computer.  Brilliant's products do not "receive and compare…time signals

2   from…measurement circuits" as recited in the claims.  (Behiel Decl., Ex. C at 16:43-44.)

3          The asserted claims of the '649 and '671 patents include limitations requiring that certain

4   components in the interpolators be in "parallel." As explained below, the design of Brilliant's

5   products is substantially different than the design reflected in the '649 and '671 patents, with the

6   result that this limitation is not met. GuideTech's efforts to find parallel components lead to

7   absurd results.

8   **II.     CLAIM CONSTRUCTION PRINCIPLES**

9          **F.  The Law Governing Claim Construction**

10         "It is well-settled that, in interpreting an asserted claim, the court should look first to the

11  intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in

12  evidence, the prosecution history." *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582

13  (Fed. Cir. 1996) (citing *Markman v. Westview*, 52 F.3d at 979); *See also Phillips v. AWH,* 415

14  F.3d at 1314.  "The prosecution history…consists of the complete record of the proceedings

15  before the PTO and includes the prior art cited during examination of the patent" (*Id.* at 1317,

16  citing *Autogiro v. U.S.,* 384 F.2d at 399). "In its broader use as source material, the prior art cited

17  in the file wrapper gives clues as to what the claims do not cover." *Westinghouse Electric & Mfg.*

18  *Co. v. Formica Insulation Co.,* 266 U.S. 342 (1924); *Remington Rand, Inc. v. Meilink Steel Safe*

19  *Co.,* 140 F.2d 519 (6th Cir. 1944); *Moto-Mower Co. v. E. C. Stearns & Co. Inc.,* 126 F.2d 854 (2d

20  Cir. 1942); *Autogiro v. U.S.,* 384 F.2d 391 (1967).

21         The Federal Circuit has "authorized district courts to rely on extrinsic evidence, which

22  'consists of all evidence external to the patent and prosecution history, including expert and

23  inventor testimony, dictionaries, and learned treatises'." *Phillips v. AWH*, 415 F.3d at 1317 (Fed.

24  Cir. 2005).

25              However, while extrinsic evidence "can shed useful light on the relevant
                art," we have explained that it is "less significant than the intrinsic record
26              in determining 'the legally operative meaning of claim language'."

27  *Id.* citing *C.R. Bard Inc. v. U.S. Surgical Corp.,* 388 F.3d at 862, (Fed. Cir. 2004).

28

1    Expert testimony can be useful extrinsic evidence, but "conclusory, unsupported assertions

2   by experts as to the definition of a claim term are not useful to a court." *Id.*  Indeed, "a court

3   should discount any expert testimony 'that is clearly at odds . . . with the written record of the

4   patent.'" *Id.* citing *Key Pharms v. Hercon Lab. Corp.,* 161 F.3d at 716 (Fed. Cir. 1998).

5    **G.  A Person of Ordinary Skill in the Art**

6    The Patents describe time-measurement instruments that employ triggering signals and

7   interpolator circuits, such circuits involving digital and analog electronic components.  A person

8   of ordinary skill in the art of these patents has an advanced degree (an M.S. or higher) in

9   Computer Engineering, Electrical Engineering, Physics or a similar area, and at least two to three

10   years of experience in the areas of analog and/or digital circuit analysis and design.  If such

11   experience is more extensive than this, then a Bachelor of Science degree should suffice. (Kaliski

12   Decl., ¶ 4.)

13   **III.    CONSTRUCTION OF THE DISPUTED CLAIM TERMS**

14    **A.  Signal Channel**

| Term | Brilliant's Construction | GuideTech's Construction |
| --- | --- | --- |
| Signal channel | A physical collection of related components capable of acting independently to perform a useful function on a signal. | An electrical circuit that includes a signal path for transmitting electrical signals and includes one or more parallel measurement circuits |

19    Brilliant defines a signal channel as "a collection of related components capable of acting

20   independently to perform a useful function on a signal."  The structures that support the claimed

21   "signal channel" are channels 12 and 14, depicted in Fig. 1 of the Patents.  A channel has its own

22   input port.  Preferably, channels are "isolated from each other…and each channel has its own

23   power supply." (Behiel Decl., Ex. C at 6:6-8.)  Each channel "includes one or more parallel

24   measurement circuits, each of which may be driven by an external signal received from the same

25   input port . . ." (Behiel Decl., Ex. C at 6:1-4.)  Each channel can act independently to measure

26   timing characteristics of signals presented on their respective inputs, Ain and Bin. An example of

27   how channel 12 can be used to measure pulsewidth appears at Behiel Decl., Ex. C at 5:26-45.

28   Channel 14 is the same. (Behiel Decl., Ex. C at 3:61-64.) While each channel can perform

1   independent measurements, "signals may cross from one channel to another" for certain types of

2   measurements. (Behiel Decl., Ex. C at 6:4-6.)  One such cross-channel configuration for

3   measuring the duty cycle of a signal is detailed at Behiel Decl., Ex. C at 15:13-15.

4           GuideTech's proposed construction is incomplete. While true that a signal channel must,

5   according to the '231 specification, include at least one measurement circuit, it is also clear that

6   such a channel requires far more than "a signal path."  The only examples of channels depicted in

7   the figures of the '231 patent are channels 12 and 14 of Fig. 1, and each of those channels

8   "includes a control computer 16, for example a 200 MHz DSP processor, with associated memory

9   18, for example a high- performance FIFO memory, and a logic a circuit 20." (Behiel Decl., Ex. C

10  at 3:43-47.)  These elements are in addition to multiple measurement circuits. (*Id.* at 6:1-4.) To say

11  these channels have "a signal path" is a gross oversimplification. Fig. 1 shows many signal paths

12  that allow elements within each channel to communicate with one another, and these are

13  representative of a small subset of the actual signal paths.  Figs. 4A and 4B include many dozens

14  of signal paths, for example, and they represent one of two interpolators within a given channel.

15  (Behiel Decl., Ex. C at 6:50-53.)

16      **B.  Defined Within a Signal Channel**

17  
| Term | Brilliant's Construction | GuideTech's Construction |
|------|--------------------------|--------------------------|
| Defined within a signal channel | A component of only one signal channel | No construction required<br>OR<br>Present in a signal channel |

20           "Defined within a signal channel" appears in the '231 specification in the abstract and at

21  Behiel Decl., Ex. C at 2:31-32.  Although there is no express definition, the Patents support

22  Brilliant's view that for something to be "defined within" a channel it must be a component of

23  only one channel.  The TIA in Fig. 1 of the '231 patent (*See, e.g.,* Behiel Decl., Ex. C) includes

24  two channels 12 and 14, and "each channel includes multiple, in this case, two, measurement

25  circuits."  (Behiel Decl., Ex. C at 3:43:54.)  Having two measurement circuits, each channel can

26  do two-event, one-channel measurements, like pulsewidth, without having to borrow an

27  interpolator from the other channel.

28

1    Some measurements require more than two interpolators for a given signal. The '231

2  patent supports such measurements by allowing for "cross channel" signaling. Signals may "cross

3  [via a fancy switch called a "multiplexer"] from one channel to another . . . as desired in a given

4  measurement." (Behiel Decl., Ex. C at 6:4:5.) The Fig. 1 example of the '231 patent shows the

5  channels can share their interpolators to allow the TIA to perform measurements with up to four

6  interpolators even though each signal channel only includes two. In GuideTech's view, as set forth

7  by Dr. West, such sharing of measurement circuits creates new channels. (Behiel Decl., Ex. H,

8  38:5-10.) Rather than two channels 12 and 14, as shown and described, Dr. West thinks Fig. 1 of

9  the '231 patent includes "[s]ome number of multiple combinations. I would have to count."

10  (Behiel Decl., Ex. H 48:13-19.) Dr. West did admit that the number was "many more than two."

11  (Behiel Decl., Ex. H 48:21-23.) This interpretation seems to be based on Dr. West's own ideas, as

12  opposed to the intrinsic record. (Behiel Decl., Ex. H 39:24-40:9.)

13    The '231 patent contemplates the inclusion of a third measurement circuit per channel to

14  allow "three-edge" measurements to be made in a "single" channel. Recalling that channel 12 in

15  Fig. 1 of the '231 patent includes two measurement circuits to measure two edges, the '231 patent

16  describes an *alternate configuration*, in which channel 12 includes three parallel measurement

17  circuits so that the single channel can measure three subsequent edges…" (Behiel Decl., Ex. C at

18  15:16-18.) The '231 patent thus distinguishes between sharing measurement circuits between the

19  two channels 12 and 14 to make a three-edge measurement and "including" three measurement

20  circuits in a "single" channel to make the same measurement.  (Behiel Decl., Ex. L ¶ 58.) The '231

21  patent thus does not consider shared measurement circuits to create a single channel.

22    Since "defined within a channel" is not expressly defined in the patent, examination of the

23  ordinary meaning of "defined," as evinced by a standard dictionary, may further inform

24  construction. This is permissible so long as a "dictionary definition does not contradict any

25  definition found in or ascertained by a reading of the patent documents." *Vitronics Corp v.

26  Conceptronic, Inc.,* 90 F.3d 1576, 1584 (Fed. Cir. 1996). Turning to GuideTech's Webster

27

28

1   reference[4], to "define" is "to determine or fix the boundaries or extent of."  (Webster's example is

2   "*to define property with stakes*.")  Something "defined" has <u>fixed</u> or <u>determined</u> <u>boundaries</u>. It

3   therefore stands to reason that something "defined within" is <u>within fixed or determined</u>

4   <u>boundaries</u>.  The ordinary meaning thus naturally aligns with the teachings of the specification.

5   The components of a signal channel are corralled within its boundaries and remain there.

6   Brilliant's construction finds ample support in the intrinsic record and in the ordinary meaning of

7   "defined within," and should therefore be adopted.

8          GuideTech's construction conflicts with important parts of the intrinsic record.  As

9   construed by GuideTech, "present in a signal channel" covers prior art cited in the '231 patent file

10  history and products sold by GuideTech years before the priority date of the Patents.  Cited prior

11  art "gives clues as to what the claims do not cover." *Autogiro v. U.S.* 384 F.2d at 399 (1967). The

12  '231 file history reveals that Shalom Kattan, the inventor, submitted a letter identifying a block

13  diagram of a TIA called the DTS 2070/2075 (the "DTS") as prior art. The DTS can be configured

14  to allow each of two channel inputs to be directed to either one or both of two interpolators. In the

15  latter case, both interpolators would seem to be "defined within a signal channel" under

16  GuideTech's interpretation. (Behiel Decl., Ex. L ¶ 9.) GuideTech's construction should be

17  disfavored because it reads on this prior art of the intrinsic record.

18         Brilliant understands that extrinsic evidence, which "consists of all evidence external to the

19  patent and prosecution history," is not as important as the intrinsic record. *Phillips v. AWH*, 415

20  F.3d at 1317 (Fed.  Cir. 2005), citing *Markman v. Westview*, 52 F.3d at 980). Brilliant nevertheless

21  considers some GuideTech prior art to be of interest, if only because it sheds light on what the

22  inventor, Shalom Kattan, considered old when he filed the applications that matured into the

23  Patents.  The '231 patent, if construed so broadly as to cover the Brilliant products, also covers the

24  products sold by GuideTech for many years before the priority dates of the Patents.  These

25  products include the GT200, a TIA with essentially the same architecture as the aforementioned

26  DTS of the intrinsic record.  Brilliant has repeatedly explained to GuideTech that the prior-art

27  GT200 product would have two measurement circuits "defined within a signal channel" if that

28  

---
[4] Ex. J, Webster's Encyclopedic Unabridged Dictionary (1996), at 523, "define" at 4

1    language was construed so broadly as to cover the Brilliant products. *See, e.g.,* "Brilliant's

2    Preliminary Invalidity Contentions" of June 17, 2010. (Behiel Decl., Ex. K.)

3            GuideTech has cast their net so broadly that their claims cover the prior art GT200.

4    GuideTech's expert, Dr. Sassan Tabatabaei Zaverah, testified that the GT200 can be configured to

5    include "a plurality of measurement circuits defined within a signal channel" under what appears

6    to be GuideTech's overly broad claim construction. (Behiel Decl., Ex. T at 68:10-18.)

7            The GuideTech construction of "defined within a channel" is unsupported in the

8    specification, was arrived at without consideration of important parts of the intrinsic record, and is

9    so broad that it covers prior art cited in the file history of the '231 patent, and other prior art sold

10   by GuideTech years in advance of filing the Patents. Brilliant's construction finds support in the

11   specification and excludes both the cited prior art and the similar prior art sold by GuideTech.

12           **C.  Current Source**

| Term | Brilliant's Construction | GuideTech's Construction |
|------|--------------------------|--------------------------|
| Current Source | An active circuit that provides an electrical current that is independent of the voltage across the circuit. | An electrical component that delivers electric current. |

17           Claim 1 of the '671 patent refers to a "current source," which Brilliant construes as "an

18   active circuit that provides an electrical current that is independent of the voltage across the

19   circuit."  This construction is consistent with the specification and with the definitions set forth in

20   GuideTech's extrinsic references: (i) "[a] circuit element that will maintain a prescribed current

21   within its terminals regardless of the voltage across its terminals." *See* Behiel Decl., Ex. M, James

22   W. Nilsson, *Electronic Circuits* (1983) (the "Nilsson Text"); and (ii) "[a] circuit element where the

23   current through it is independent of the voltage across it."  *See* Behiel Decl., Ex. N, Wikipedia,

24   *Current Source* (3/1/2011)[5]  GuideTech's own expert, Dr. Sassan Tabatabaei Zaverah, agrees with

25   Brilliant's definition as to the function of a current source (Behiel Decl., Ex. T at 82:25-83:6.)

26

27   _____

     [5] Between 1/1/2011 – 3/1/2011, the Wikipedia "Current Source" page relied on by GuideTech was
28       revised by at least seven different authors.  One revision is reported to have been the result of
         possible vandalism.

1       Brilliant's construction of current source differs from the construction set for in the Joint

2  Claim Construction Statement. (Dkt. 84.) That earlier construction required the recited current to

3  be "constant." That construction is consistent with every "current source" in the Patents: they

4  simply used "current source" and "constant current source" interchangeably. However, there is a

5  class of circuits called "dependent" current sources for which the output current can change based

6  on some controlling input signal. (Behiel Decl., Ex. M at 15 and 16, and Ex. N at 1 and 2). Though

7  the intrinsic record does not appear to include such a device, one can imagine a dependent current

8  source with a varying output current. Brilliant thus considers a more precise construction of

9  "current source" to omit the word "constant." Brilliant's construction retains the current's

10  independence of voltage, the defining characteristic of a "current source."

11       GuideTech's definition, "an electrical component that delivers electrical current," is

12  inconsistent with both the intrinsic record and extrinsic evidence. The '671 patent describes, for

13  example, "[a] constant current source 46 [that] <u>draws</u> current through [a] transistor 42, thereby

14  discharging [a] capacitor 34" (Behiel Decl., Ex. A at 6:27-29.) (emphasis added) GuideTech's

15  construction seems to exclude this current source because it "draws" rather than "delivers" current.

16       GuideTech's definition apparently parrots the first line of the Wikipedia Current Source

17  Article. (*See* Behiel Decl., Ex. N.)  The second line and the remainder of the article refine the

18  meaning of "current source" and favor Brilliant's construction.  For example, the article contrasts

19  a current source as "the dual of a voltage source." That is, a "voltage source" provides a voltage

20  independent of the current through it, whereas a "current source" provides a current independent

21  of the voltage across it. *See, e.g.,* Behiel Decl., Ex. O, Horowitz and Hill, *The Art of Electronics,*

22  2nd Ed. 1989, at 9, proffered by GuideTech. A voltage source, such as a battery, is a source of

23  electrical current, and thus falls within GuideTech's construction of "current source"; according to

24  GuideTech's proffered extrinsic evidence however, a battery is clearly *not* a current source.

25       In short, GuideTech's construction of current source excludes some circuits identified as

26  "current sources" in the intrinsic record, and encompasses circuits that are most certainly not

27  "current sources" as defined by the extrinsic evidence. Brilliant's construction is supported by the

28  intrinsic record and by extrinsic evidence, including one of GuideTech's experts.

**D.  Current Sink**

| Term | Brilliant's Construction | GuideTech's Construction |
|------|--------------------------|--------------------------|
| Current sink | A current source that draws an electrical current. | An electrical component that absorbs electric current. |

Some circuits in the '671 are referred to both as current sources and current sinks. For example, a "constant current source" described as drawing "a 25 milliamp (ma) current" at Behiel Decl., Ex. A at 8:51-63 is later referred to as a "25 ma current sink." (Behiel Decl., Ex. A at 9:42-49.) Within the meaning of the '671 patent, a current source that "draws" electrical current is therefore a current sink. The asserted claims use "source" and "sink" to distinguish current sources that provide current—current sources—from those that receive current—current sinks.[6]

GuideTech's construction of "current sink" is confusing and unsupported. The term "absorb" is not mentioned in the Patents. Current sinks are said to "draw current" (Behiel Decl., Ex. A at 9:28-30, 9:43-45, 9:49-50), not to absorb it. Without knowing what it means to "absorb" current, GuideTech's construction does little to distinguish "current sink" from other elements. GuideTech's unsupported and vague construction should be rejected in favor of Brilliant's.

**E.  Operatively Disposed in Parallel**

| Term | Brilliant's Construction | GuideTech's Construction |
|------|--------------------------|--------------------------|
| Operatively disposed in parallel | Forming alternative signal paths between the same source and destination, wherein the same voltage change occurs across both paths. | Arranged in a manner capable of providing alternate paths of current between them. |

Words in a claim are generally given their ordinary and customary meaning unless a patentee specially defines his own terms, "as long as the special definition of the term is clearly stated in the patent specification or file history."*Vitronics Corp v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996), citing *Hoechst Celanese Corp. v. BP Chems., Ltd.,* 78 F.3d 1575, 1578 (Fed. Cir. 1996). "Operatively disposed in parallel" is not defined in the '671 patent specification or file history.  The meaning of "parallel" in the context of the '671 patent relates, of course, to electronic circuitry. Those skilled in the art are well versed in the meaning of "parallel."

---

[6] Brilliant's construction of "current sink" omits the term "constant" for the reasons presented above in connection with "current source."

1    Brilliant defines "operatively disposed in parallel" as "forming alternative signal paths

2    between the same source and destination, wherein the same voltage change occurs across both

3    paths."  This definition is not exactly consistent with the meaning of "parallel" as understood by

4    those of skill in the art, as parallel elements have the same voltage across them, not just the same

5    voltage changes. Brilliant advances this construction because the shunt and capacitor that provide

6    support for the asserted claims are not strictly in parallel, in the conventional sense, in Figs. 4A

7    and 4B in the Patents. The signal paths in which they exist do operate as though they are parallel,

8    however, which Brilliant considers within the bounds of "operatively disposed" in parallel.

9    GuideTech's proffered evidence supports Brilliant's construction of "parallel": "parallel"

10   is defined, for example, as "an arrangement of the components…in such a way that…the same

11   voltage [is] applied to each component[7]."  Brilliant's extrinsic evidence similarly agrees: "[m]ore

12   simply . . . all components connected in parallel have the same voltage across them[8]." Fig. 1.6 of

13   Lunn depicts a parallel circuit (Behiel Decl., Ex. P, Lunn, at 5). As that figure shows, each

14   element, e.g., Resistor, Capacitor, etc., forms an alternative signal path, each is between the same

15   source (upper bar) and destination (lower bar), and the same voltage ($V_s = V_1 = V_2 = V_3 = V_4 =$

16   $V_5$) appears across all paths (i.e., the components shown in the figure). In this configuration, any

17   change in voltage across one path will be experienced by each element. If the voltage $V_2$ were to

18   change across the capacitor, for example, the same change would occur across the other paths.

19   GuideTech's definition of "operatively disposed in parallel" is vague and indefinite in that

20   it requires "paths of current between them," without identifying the "them." Under its plain

21   meaning, "them" is a pronoun that refers to any collection of two or more things.  The intrinsic

22   and extrinsic evidence do not support such a vague and unbounded construction. In effect,

23   GuideTech's definition removes the limitation "parallel" from the claims.

24   GuideTech's construction of "operatively disposed in parallel" is overly broad and

25   unsupported by the intrinsic and extrinsic evidence. That same evidence supports Brilliant's

26   relatively simple construction. Accordingly, the Court should adopt Brilliant's construction.

27

28   [7] Ex. J, Webster's Encyclopedic Unabridged Dictionary (1996), at 1407, "parallel" at 13
     [8] Ex. P, Lunn, The Essence of Analog  Electronics (1997) at 5 ¶ 1.2.1 "Kirchhoff's voltage law

### F.  Parallel Outputs

| Term | Brilliant's Construction | GuideTech's Construction |
|------|--------------------------|--------------------------|
| Parallel Outputs | Alternative output signal paths to a common destination, wherein the same voltage changes occur across both paths. | Outputs that are arranged such that a current path divides between them. |

The main difference between the Brilliant and GuideTech constructions of "parallel outputs" relates to Brilliant's requirement that the same voltage change occur across multiple paths. The term "parallel" is not defined, much less clearly stated, in the specification or file history. Under *Vitronics*, the term "parallel" should therefore be afforded its ordinary and customary meaning. As detailed above in connection with "operatively disposed in parallel," the term "parallel" has an ordinary meaning that is well understood by those of skill in the art. GuideTech's construction ignores that meaning and effectively removes the term "parallel" from the claim.

### IV.    SUMMARY JUDGMENT OF NONINFRINGEMENT

#### A.  The Law Applicable to Summary Judgment

A court should grant summary judgment if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); FED. R. CIV. P. 56(c).  In deciding a motion for summary judgment, a court need not resolve disputed issues of fact, but need only determine whether there is any genuine issue of material fact to be tried. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).  A genuine factual dispute is material only if it affects the outcome of the case. *Id.* at 248.

#### B.  The Law of Infringement

"It is also well settled that each element of a claim is material and essential, and that in order for a court to find infringement, the plaintiff must show the presence of every element or its substantial equivalent in the accused device." *Lemelson v. United States,* 752 F.2d 1538, 1551 (Fed. Cir. 1985).  The legal rule for finding elements by substantial equivalence is known as applying the "doctrine of equivalents." A patentee may show equivalency of a claim element by showing that an aspect of the accused product or process performs substantially the same function,

1   in substantially the same way, to achieve substantially the same result, as the claim element.

2   *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608, 70 S. Ct. 854, 94 L. Ed.

3   1097, 1950 Dec. Comm'r Pat. 597 (1950). "Equivalency may also be proven where the differences

4   between the invention as claimed and the accused product or process are insubstantial." *Abbott*

5   *Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1296-1297 (Fed. Cir. 2009).

6        Patent L.R. 3-1(e) required GuideTech to identify whether each limitation of each asserted

7   claim is alleged to be literally present or present under the doctrine of equivalents. GuideTech

8   rather unhelpfully took the position that "each and every limitation of each asserted claims [sic] is

9   either literally present or present of [sic] the doctrine of equivalents…" (Behiel Decl. Ex. Q at 5:7-

10  8.) GuideTech then provided claim charts in which they identified the vast majority of claim

11  elements as present "or the equivalent." Brilliant still does not know which elements GuideTech

12  considers to be present by equivalents.

13       **C.  Dr. West's Expert Witness Testimony Should be Disregarded**

14       The Noninfringement Report of Brilliant's expert, Dr. Kaliski, sets forth Brilliant's

15  noninfringement case in detail for each claim of the Patents (Behiel Decl., Ex. I). In preparing his

16  report, Dr. Kaliski considered the full intrinsic records, considerable other prior art, and

17  GuideTech's positions. GuideTech elected not to cross examine Dr. Kaliski.

18       GuideTech offers the January 28, 2011, *Infringement Report of Dr. Burnell G. West, (See*

19  Behiel Decl., Ex. R), in support of their infringement case. Brilliant has long argued that

20  GuideTech's claim constructions must be overly broad if they are to capture Brilliant's products.

21  In support of this view, Brilliant informed GuideTech that such overly broad constructions cover

22  (1) cited prior art; and (2) prior art products still being sold by GuideTech. Dr. West's report

23  indicates that he considered documents Brilliant provided to GuideTech outlining these issues to

24  GuideTech's charges of infringement. Dr. West nevertheless arrived at his deposition wholly

25  unprepared to address Brilliant's infringement defenses.

26       The determination of infringement is a two-step process that begins with claim

27  construction. Claim construction is done with a view to the intrinsic record of the patents-in-suit,

28

1   which includes both the specification and cited prior art. Only once properly construed should the

2   claims be compared to the accused product.

3          Dr. West testified that he did not read the cited prior art (Behiel Decl., Ex. H at 18:3-10),

4   and that he was not familiar with the GuideTech prior art (Ex. H at 22:5-8, and 23:12-25). Just as

5   troubling, Dr. West was ignorant of key portions of the Patents themselves. Figs. 4A and 4B are

6   the only figures of the Patents that support the claims of the '649 and '671 Patents. (Kaliski Decl.

7   ¶¶ 5-6.) Dr. West was not prepared to discuss this critical intrinsic evidence, however, as he did

8   not "dig into" Figs. 4A and 4B.  (Ex. H at 211:11-23). When asked to locate the "current sources"

9   in those figures, Dr. West replied, "I didn't study this ['671] patent, so I don't know how these

10  current sources[9] are used." (Ex. H[10] 213:11-12.) Since "the Asserted Patents have almost identical

11  specifications," (*Id.* ¶ 44), Dr. West's ignorance as to '671 patent can only derive from a failure to

12  thoroughly review *any* of the patents.

13         While ignorant of the GuideTech prior art and that of the intrinsic record, Dr. West told

14  GuideTech's attorneys of trade secret prior art that anticipates claims of the asserted patents.  Dr.

15  West referred to this prior art as the ITS9000, a time-measurement instrument Dr. West helped to

16  design.[11] Dr. West, evidently untroubled that his claim constructions read on the ITS9000, testified

17  that he "didn't think it was relevant to the question," (Ex. H at 238:22-23), and that "the question

18  had to do with whether or not the GuideTech patents had been infringed by Brilliant…" (*Id.* 239:1-

19  3)  Dr. West thus appears to have been construing the claims with an eye to a finding of

20  infringement. This approach is improper, as claims should <u>not</u> be construed based on the accused

21  device. *Exigent Tech. v. Atrana Solutios, Inc.,* 442 F.3d 1301, 1309 n. 10 (Fed. Cir. 2006).

22         Dr. West construed the claims to find infringement. In doing so, he failed to consider any

23  of the cited prior art, even one reference that Brilliant specifically pointed to as precluding a broad

---

[9] "Current sources" are a disputed claim term.
[10] Excerpts from Dr. West's 3/3/2011 Deposition Testimony are attached hereto as Ex. H.
[11] Brilliant first learned of the import of the ITS9000 on March 3, 2011, when Dr. West testified that the ITS9000 included all the elements of many claims of the asserted patents.  The ITS9000 was sold before 1993, six years before the asserted patents' filing date.  The ITS9000, including the secrets, are therefore 35 U.S.C. 102(b) prior art.  Dr. West disclosed the significance of the ITS9000 to GuideTech's attorneys, but GuideTech disclosed nothing to Brilliant.

1   construction of claim language in the '231 patent. Dr. West also failed to study the relevant

2   portion of the patents' specifications and figures when arriving at the meanings of terms in the

3   '649 and '671 patent. Dr. West's findings of infringement are thus based on insufficient facts and

4   a flawed claim-construction process. Dr. West's testimony relating to infringement is not entitled

5   to any weight.

6          **D.  Noninfringement of the '231 patent**

7          Each independent claim of the '231 patent recites a "time interval analyzer (TIA) for

8   measuring time intervals between signal events," and these TIAs each include (1) "a plurality of

9   measurement circuits defined within [a] signal channel…"; and (2) "a processor

10  circuit…configured to receive and compare…time signals from said measurement circuits to each

11  other to determine a time interval…" The Brilliant products lack both of these elements, and

12  consequently distinguish all the independent claims of the '231 patent. Because dependent claims

13  include all the limitations of the claims from which they depend, the Brilliant products necessarily

14  distinguish the dependent claims of the '231 patent for at least the same reasons.

15         The Brilliant products can be configured to measure, e.g., pulsewidths, and Brilliant

16  understands such a configuration to be the basis for GuideTech's infringement contentions for,

17  e.g., claim 1 of the '231 patent, as laid out in their Amended Disclosure of Asserted Claims and

18  Infringement Contentions. (Behiel Decl., Ex. Q at A1-A6.) In support of GuideTech's position,

19  Dr. West opines that the timetag circuits are "measurement circuits," and that when a Brilliant

20  product is configured to measure two events on the same input channel, the measurement circuits

21  "are within either signal channel A or signal channel B as shown in Figure 2." (Behiel Decl., Ex.

22  R at A2.) Dr. West thus considers "defined within a signal channel" to include what the '231

23  patent refers to as "cross-channel" communication. Dr. West does not "see anything that

24  specifically supports [his construction] as such," and his attempts to explain his support are largely

25  nonsense. (Behiel Decl., Ex. H 127:3-19.)

26         The construction set forth by GuideTech and Dr. West is overly broad, in part because they

27  failed to consider any of the cited prior art, including the aforementioned DTS. (Behiel Decl., Ex.

28  H at 18.) Had they considered this reference, they would have noted that their construction of "a

plurality of measurement circuits defined within a signal channel" reads on the DTS in the intrinsic record. GuideTech's other expert, Dr. Sassan Tabatabaei, first viewed the DTS during his deposition and agreed it would be reasonable to construe the claims to cover the cited DTS.

> Q. In that scenario where … we're using the first 800-femtosecond interpolator [of the DTS 2070/2075] for the leading edge and the second 800-femtosecond interpolator for the trailing edge, in that case do we have two measurement circuits, two interpolators defined within Channel 1?
>
> A. That's -- that would be reasonable, yes.

(Behiel Decl., Ex. T at 103:20-104:2.) The expert reports of Dr. West and Dr. Tabatabaei do not offer claim constructions for "defined within a signal channel," so we cannot be sure they are using the same construction. We do know, however, that Dr. Tabatabaei's construction stretches over the cited DTS prior art. Only Dr. West opined as to infringement, and he simply failed to consider the DTS, or any of the cited art for that matter.

Unlike Dr. West, Brilliant's expert Dr. Kaliski did consider the cited prior art, including the DTS (Kaliski Decl., ¶ 7.). Dr. Kaliski concluded that this information, and the DTS in particular, was highly relevant to claim construction (Kaliski Decl., ¶ 8). In his expert report, Dr. Kaliski explained:

> The diagram of the DTS 2070/2075 includes all the salient features of the accused products [and] shows that Shalom Kattan and the examiner did not consider "defined within a signal channel" to include a multiplexer configuration.

(Behiel Decl., Ex. L, ¶ 55). The BI200[12] and DTS TIAs each have one measurement circuit per channel; each channel can send signals across to the other channel to facilitate, e.g., pulse-width measurements that require a second measurement circuit; and the channel whose measurement circuit is "borrowed" is unavailable. If the measurement circuits of the Brilliant products are "defined within" the same channel when thus configured, so too must the measurement circuits of the cited prior-art DTS instrument. (Behiel Decl., Ex. L ¶ 9.). GuideTech's expert, Dr. Sassan Tabatabaei, agrees.  (Behiel Decl., Ex. T at 68:10-18.)

In contrast to the Brilliant products and the DTS instrument, each signal channel in Fig. 1 of the '231 patent "includes multiple, in this case two, measurement circuits." (Behiel Decl., Ex. C

---

[12] The arguments presented herein in connection with the BI200 apply equally to the BI220.

at 3:53-54.) The inclusion of multiple measurement circuits "defined within" each channel enables measurements like pulsewidth to be carried out on one channel without impacting the performance of the other. This capability is, according to Dr. West, the advantage of having more than one interpolator per channel. (Behiel Decl., Ex. H 50:4-11.) The BI200, like the DTS, has but one measurement circuit for each channel, and so lacks this advantage and distinguishes the claims.

Each claim of the '231 patent additionally recites "a processor circuit…configured to receive and compare…time signals from said measurement circuits to each other to determine a time interval between [a] first event measured by a first said measurement circuit and an event measured by a second said measurement circuit." Each of the recited "time signals" finds support in a capacitor voltage from an interpolator of the '231 patent. (*See* Behiel Decl., Ex. C at 4:57-64.) The Brilliant products have interpolators that develop such "time signals," but the Brilliant products do not compare such time signals "to each other to determine a time interval" between events measured by different measurement circuits. (Behiel Decl., Ex. L at ¶ 60).

GuideTech argues that "time tag" signals can be the "time signals" of the claims. This is not the case. In the claims, the measurement circuits "measure an occurrence of a first event with respect to a predetermined time reference and output a <u>time signal</u> corresponding to the measurement of said event…" The "time signal" is thus a measure of the timing of an event "with respect to" a time reference. Consistent with this view, the only "time signals" noted in the '231 patent are interpolator output voltages that "correspond to the occurrence of [a] signal edge with respect to a predetermined time reference." (Behiel Decl., Ex. C at 4:57-64.) In that same paragraph, the exemplary "predetermined time reference" is "clock pulse edge." (Behiel Decl., Ex. C at 4:51-57.) While such time signals can be compared "to each other to determine a time interval between" events, the Brilliant products do not work that way. Instead, Brilliant products use similar "time signals" and other information to calculate time tags, which can then be compared to determine a time interval. (Behiel Decl., Ex. L ¶ 62.)

Contrary to GuideTech's position, Brilliant's "time tags" cannot be the "time signals" of the claims. The '231 patent distinguishes between "time tags," also called "measurement tags," and "time signals." In the '231 patent, a "measurement tag" is something that "indicates the time

[a] signal edge occurred and the edge's position within [a] sequence of edges." (Behiel Decl., Ex. C at 5:20-23.) A "time signal" is merely a voltage across the capacitor. (Behiel Decl., Ex. C at 4:57-64.)  "Upon receiving the time tag information, the computer knows a measurement has occurred and therefore reads the voltage across capacitor 96…" (Behiel Decl., Ex. C at 10:41-44.) Given that the "time tag information" triggers the computer to read the time signal, the "tags" cannot be the "time signal." With reference to the diagram at section I(A) *supra,* measurement tags (aka "time tag" information) of the '231 patent correspond to the bold arrows indicating clock edges at 2 and 5, and the time signals would be voltages from respective measurement circuits representing the head and tail fragments.

Dr. West opines that the Brilliant interpolators compare time signals, and claims to provide support for this position in Appendix D of his report (Behiel Decl., Ex. R ¶ 87). Dr. West's Appendix D does not provide any basis for concluding that the accused products "compare…time signals from measurement circuits," however. Dr. West's opinion seems to be a mere parroting of the claim language without reference to the accused products. GuideTech's contentions are no better, offering only the high-level diagram and related functional description of the Brilliant datasheet in support of their infringement claim. Signals that can be characterized as "time signals" per the claims of the '231 patent are never compared to each other as claimed[13]. The Brilliant products distinguish the claims of the '231 patent for this additional reason.

### E.  Noninfringement of the '671 patent

Independent claims 1, 15, 18, and 20 of the '671 patent are asserted. Dependent claims 2 and 4-9 of the '671 patent are also asserted.  Each independent claim recites, *inter alia,* "a first current circuit having a constant current source or a constant current sink," and a shunt and capacitor "operatively disposed in parallel with respect to said first current circuit . . ." The claims also require a "second current circuit" that includes a current source or sink, but the parties agree that this element is met. The dispute therefore relates to whether the Brilliant products include (1) a "first current circuit having a constant current source;" and (2) a shunt and capacitor "operatively

---

[13] For a detailed treatment of how the timetag circuits are used to compute time intervals, *See* Ex. L at ¶¶ 62-72, Dr. Kaliski's Rebuttal Report.

1   disposed in parallel with respect to said first current circuit."

2       Brilliant's products do not include the "constant current source" of the claims under either

3   party's construction. GuideTech's determined effort to find one is fraught with inconsistencies.

4   GuideTech's Infringement contentions and Dr. West's report seem to indicate that "a current

5   source" isn't even a circuit. They assert that "a constant current source *is maintained* to the left of

6   capacitors C334 and C336…" (Behiel Decl., Ex. Q at A17; Behiel Decl., Ex. R at A22.) Even

7   under GuideTech's strained construction, a "current source" is an "electrical component," not

8   something that is "maintained to the left."

9       Questions put to Dr. West to illuminate GuideTech's understanding of "current source"

10  only led to further confusion. With reference to the accused interpolator, Dr. West testified: "The

11  actual current source is the operational amplifier in conjunction with the voltage reference and the

12  resistor. That's a constant current source." (Behiel Decl., Ex. H at 80:6-9.) Dr. West drew a

13  boundary around what he considered to be the "constant current source" (*See* Behiel Decl., Ex. S),

14  emphasizing that "the boundary has to include all – all of the parts – all of the parts that can

15  provide current to this node, because they're all interacting with the operational amplifier."

16  (Behiel Decl., Ex. H at 82:22-83-3.) (emphasis added) Looking at Dr. West's boundary, one can

17  see that it encompasses a considerable number of components in addition to the resistor Dr. West

18  labeled as R243. Of interest, the boundary includes capacitors C334/C336, which are not part of

19  the "first current circuit" of GuideTech's infringement contentions. (Behiel Decl., Ex. Q at A17.)

20      Despite his label to the contrary, Dr. West's bounded circuitry cannot be a "constant

21  current source" because the current it provides is sometimes 20 milliamps and at other times zero.

22  Recognizing this during his deposition, Dr. West quickly changed his testimony:

23      Q.  So the output of the constant current source is sometimes on the order of 20
            milliamps, and sometimes it's zero?

24      A.  The resistor itself is really the constant current source.

25  (Behiel Decl., Ex. H at 101:15-19.) Dr. West's "constant current source" thus collapsed during

26  cross examination from the complex circuitry he bounded and labeled to a single resistor.

27      The view that resistor R243 is a "constant current source" is diametrically opposed to Dr.

28  West's prior testimony, is unsupported by GuideTech's infringement contentions, and is

1   inconsistent with Dr. West's expert report. It is also wrong from a technical perspective; resistor

2   R243 cannot be a "constant current source" because a resistor is not a current source under a

3   proper construction of that term. Further, R243 cannot be a "*constant* current source" under either

4   construction because the current through R243 is far from constant. Again contradicting his earlier

5   testimony, Dr. West agreed that the behavior of the current through R243 is not consistent with the

6   idea of a constant current source. (Behiel Decl., Ex. H at 146:1-7.)

7        It would appear that GuideTech and Dr. West have not yet decided which element of the

8   Brilliant interpolator is a "current source." This apparent confusion is not a technical one: there is

9   no current source, constant or otherwise, and the Brilliant products cannot infringe the claims of

10  the '671 patent for this reason alone. Nor can the circuitry Dr. West identifies in his testimony,

11  (Behiel Decl., Ex. S), be an "equivalent" to a constant current source. Using the "function, way,

12  result" test of *Graver Tank*, the function of a current source is to produce a current that is

13  independent of voltage; the result is the independent current. The circuitry Dr. West considers a

14  "constant current source" is an integrator (*See* Behiel Decl., Ex. L at ¶¶ 23, 24, and 104 the Kaliski

15  Rebuttal Report.) The Brilliant integrator does not produce a constant current, but rather integrates

16  a current, and so performs a different function than a constant current source. The result provided

17  by the integrator is a voltage change that is proportional to the integration of the current. The way

18  an integrator integrates a current to provide a voltage is also quite different than the way a constant

19  current source creates a constant current. In short, the Brilliant integrator is substantially different

20  from a constant current source, and so cannot be considered an equivalent.

21        As Dr. Kaliski pointed out in his Rebuttal Report, Dr. West's "handling of 'insubstantial

22  differences' is incomplete at best," and "some of the equivalents that [Dr. West] proposes seem to

23  go against a basic core understanding of what common terms mean…" (Behiel Decl., Ex. L at 33-

24  34). Dr. Kaliski specifically details problems with Dr. West's construction of "current source,"

25  and explains why the accused Brilliant structure is substantially different from a "current source"

26  (Behiel Decl., Ex. L at 92-101.)

27        The claims of the '671 patent also require that the capacitor and shunt be "operatively

28  disposed in parallel with respect to the first current circuit." GuideTech resorts to an alternative in

1   which the capacitor and shunt are either parallel "or in a configuration that is equivalent…"

2   (Behiel Decl., Ex. Q at A20). With reference to Exhibit 9 of Dr. West's deposition, (Behiel Decl.,

3   Ex. S), in which Dr. West bounded the "first current circuit," it is apparent that the capacitors fall

4   neatly within the boundary. As noted before, Dr. West at one point opined that the capacitor had to

5   be part of the "first current circuit," which is coextensive with the "constant current source."[14] Dr.

6   West does not explain in his report or elsewhere how he construes "operatively disposed in

7   parallel with respect to," so we can only guess. It seems clear, however, that whatever his

8   construction, "operatively disposed in parallel" cannot capture both the shunt, which is plainly

9   outside the bounds of his "first current circuit," and the capacitors, which are part of his "first

10   current circuit." When this problem was pointed out to Dr. West, he again turned to an argument

11   based on functional equivalents (Behiel Decl., Ex. H at 95:3-10.). Dr. West's and GuideTech's

12   views of equivalents are grossly flawed.[15]

13          When showing an element by equivalents, "the doctrine of equivalents must be applied to

14   individual elements of the claim, not to the invention as a whole." *Warner-Jenkinson Co. v. Hilton

15   Davis Chem. Co.*, 520 U.S. 17, 29 (U.S. 1997). Dr. West offers no support for what it means to be

16   equivalent to "operatively disposed in parallel," but rather bases his opinion on the overall

17   operation of the Brilliant interpolator (Behiel Decl., Ex. H at 95:21-96:8.). That operation has

18   nothing whatever to do with whether the capacitor and shunt are "operatively disposed in parallel

19   with respect to" a first current circuit.

20          The accused Brilliant products include a shunt and a capacitor, but they are not

21   "operatively disposed in parallel with respect to" a "current circuit having a constant current

22   source or a constant current sink." This is true both literally and under the doctrine of equivalents,

23   as Dr. Kaliski explains in detail. (Behiel Decl., Ex. L ¶¶ 101-105.) Because dependent claims 2

24   and 4-9 include all the limitations of claim 1, the Brilliant products necessarily distinguish claim 2

25   and 4-9 for at least the same reasons they distinguish claim 1.

26          Claim 15 recites a TIA "for measuring time intervals." The TIA includes: "a differential

[14] West Depo., Ex. H at 82:23-83:4.
[15] See GuideTech's Infringement Contentions. (Ex. Q at A20.)

1    transistor pair disposed between [a] constant current source and [a] first current sink…" The

2    Brilliant interpolators lack a "constant current source," as noted previously, and thus cannot

3    infringe claim 15. Claim 15 also requires that the "transistor pair and [a] capacitor form parallel

4    outputs with respect to the constant current source…" The Brilliant interpolators lack this

5    configuration as well, and consequently further distinguish claim 15. The transistor pair and

6    capacitors of the Brilliant interpolators do not form "parallel outputs" with respect to anything,

7    much less the missing constant current source. Nor are they "equivalent" to parallel, whatever that

8    may mean, for the reasons noted above in connection with "operatively disposed in parallel" and

9    claim 1.

10       Claims 18 and 20 each recite a "time interval analyzer for measuring time intervals" that

11   includes the same limitations noted previously in connection with claim 1. The Brilliant products

12   thus distinguish claims 18 and 20 for at least the same reasons they distinguish claim 1.

13       Claim 20 additionally recites "a current boost circuit…to apply a voltage transition

14   between said first current circuit and said capacitor upon occurrence of [a] reference event…"

15   GuideTech's infringement contentions point to a voltage transition that is not "between said first

16   current circuit and said capacitor" as required by the claim, and resort to yet another equivalence

17   argument (Behiel Decl., Ex. Q at A29-30). Dr. West testified that this element is *not* met in the

18   BI200 interpolator literally, but agreed with GuideTech's view on equivalence. (Behiel Decl., Ex.

19   H at 124:2-10.) Dr. West's report does not support his view of the "operational equivalence" of

20   Brilliant's configuration. Dr. West testified that his report "does not specifically state that it's

21   equivalent," but that he "just inferred that it was [equivalent] by the behavior of the circuitry when

22   [he] was measuring it." (Behiel Decl., Ex. H at 123:3-9 and 124:2-8.) Likewise, GuideTech's

23   Infringement Contentions lack the requisite showing of substantial equivalence.

24       According to Dr. Kaliski, the Brilliant interpolators lack a current boost circuit "configured

25   to apply a voltage transition between said first current circuit and said capacitor." (Behiel Decl.,

26   Ex. L ¶ 114.) Dr. West's report opined that this element was met, but recanted under cross

27   examination, again resorting to equivalence. Neither GuideTech's Infringement Contentions nor

28   Dr. West's report provides support for application of the doctrine of equivalence to the "current

1  boost" limitation. The Brilliant products thus cannot infringe claim 20 of the '671 patent.

2      **F.  Noninfringement of the 6,181,649 (the '649 patent**

3      Claim 1 of the '649 patent recites a TIA that includes "a shunt" and "a

4  capacitor…operatively disposed in parallel with respect to [a] first current circuit" that has "a

5  current source or a current sink." These elements are lacking in the Brilliant interpolators for the

6  reasons presented above in connection with claim 1 of the '671 patent. The Brilliant products thus

7  distinguish claim 1 of the '649 patent.

8      Claim 1 of the '649 patent also recites "a current boost circuit…configured to apply a

9  voltage transition between said first current circuit and said capacitor upon occurrence of said

10  reference event…" This too is lacking in the Brilliant products, as explained above in connection

11  with claim 20 of the '671 patent. The Brilliant products thus distinguish claim 1 of the '649 patent

12  for at least this additional reason.

13      **G.  Brilliant Does not Infringe the Unopposed Patents**

14      The threatening letter from GuideTech that prompted the instant action listed, in addition

15  to those discussed previously, U.S. Patent Nos. 6,456,959; 6,621,767; 6,999,382; and 7,203,610

16  (the "Unopposed Patents"[16]). GuideTech has not asserted infringement of these patents. Brilliant's

17  noninfringement positions with respect the Unopposed Patents are set forth in Dr. Kaliski's

18  noninfringement report. (Behiel Decl., Ex. I.) Brilliant therefore asks the Court to find that the

19  Unopposed Patents are not infringed.

20  **V.    CONCLUSION**

21      Brilliant respectfully requests the Court adopt Brilliant's claim constructions and enter

22  summary judgment of noninfringement of the patents-in-suit.

23      DATED: April 1, 2011                    Respectfully submitted,

24                                              SILICON EDGE LAW GROUP LLP

25                                              */S/Arthur J. Behiel*
                                                _____

26                                              Arthur J. Behiel

27

28  _____
   [16] The Unopposed Patents are Exs. D-G to the Behiel Decl.